**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: BOEING 737 MAX | ) | |
| PILOTS LITIGATION | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | Lead Case No. 19-cv-5008 |
| | ) | |
| THIS DOCUMENT RELATES TO | ) | Consolidated cases: |
| ALL ACTIONS | ) | 19-cv-5009; 19-cv-5012; |
| | ) | 19-cv-5017; 19-cv-5019; |
| | ) | 19-cv-5020; 19-cv-5177; |
| | ) | 19-cv-5517; 19-cv-5523; |
| | ) | 19-cv-5911; 19-cv-6807; |
| | ) | 19-cv-7294; 20-cv-761; |
| | ) | and 20-cv-762 |
| | ) | |
| | ) | Hon. Steven C. Seeger |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In 2018, a Boeing 737 MAX commercial passenger airplane crashed shortly after takeoff. And then, a few months later, it happened again. Hundreds of people lost their lives, including the pilots, the crew, and the passengers. The crashes took precious lives, devastated countless people, and caused millions of dollars in damages. The disasters led to the worldwide grounding of the MAX fleet, with ripple effects that spread around the globe.

Plaintiff Mathieu Crye is an airline pilot for Air Canada, and he is certified to fly the MAX. Fortunately for him, Crye wasn't flying either of the MAX planes that went down. The same can be said for all of the other plaintiffs. They flew planes that didn't crash.

Most people would thank their lucky stars that they weren't on those planes, and leave it at that. But Plaintiffs believe that they, too, suffered an injury from the crashes, even though they never crashed. They seek to recover damages based on plane crashes experienced by other people. In their view, Boeing designed a defective plane, which led to crashes, which led to the

grounding of the fleet, which caused a loss of job opportunities, which hit them in the pocketbook.

Plaintiffs filed suit against Boeing to recover for their lost income. They bring a handful of claims including strict liability, negligence, fraudulent concealment, and fraudulent misrepresentation. They bring tort claims to recover their economic losses.

Boeing, in turn, moved to dismiss. For the reasons stated below, the motion to dismiss is hereby granted.

**Background**

At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Due to huge barriers to entry from enormous startup costs, the airplane manufacturing industry consists, almost entirely, of two companies: Airbus Group, headquartered in the Netherlands, and the Boeing Company, previously headquartered in Chicago. Together, they control 99% of the airplane manufacturing market. *See* Third Am. Cplt., at ¶ 59 (Dckt. No. 111).

As Plaintiffs tell it, a predictable consequence of this duopolistic market structure is a sort of keeping-up-with-the-Joneses (or maybe just "Jones," singular) phenomenon. When one manufacturer improves a plane, the other manufacturer must follow suit or else lose precious market share. Market share is a zero-sum proposition: one firm's gain is another firm's loss.

According to Plaintiffs (a caveat that this Court will stop repeating), that dynamic played out with disastrous results when it came to the 737 MAX. Boeing rushed its development of the MAX in an ill-fated effort to keep up with Airbus. And it led to planes falling from the sky.

### The Boeing 737 MAX

In 2011, Airbus appeared poised to win business in the single-aisle aircraft category. Airbus was launching a new model, the A320neo, which was heralded as the most technologically advanced, fuel-efficient single-aisle aircraft in the world. *Id.* at ¶ 60.

To keep pace, Boeing decided to develop a new single-aisle plane of its own, the 737 MAX. Boeing decided to modify one of its existing models, the Boeing 737NG, to become the MAX, rather than designing a new model from the ground up. *Id.* at ¶ 62.

Boeing's modifications to the 737NG resulted in serious design flaws. In particular, Boeing mounted new, larger engines in a slightly different position, which gave the modified plane "a propensity to abnormally pitch up under certain flight conditions, creating a risk that the airplane would suffer an aerodynamic stall and crash." *Id.* at ¶¶ 65–66. To correct for that problem, Boeing developed something called the Maneuvering Characteristics Augmentation System ("MCAS") to alleviate the risk of stalling. *Id.* at ¶ 68.

The MCAS received information from a sensor called the angle of attack ("AOA") sensor. If the AOA sensor detected this nose-up problem, it would trigger the MCAS, which would automatically force the nose back down toward the ground. *Id.* at ¶ 79.

The MCAS caused more problems than it solved. The MCAS would sometimes kick in when it wasn't supposed to, including during critical phases of the flight (like right after takeoff). *Id.* at ¶¶ 68, 79. Instead of "alleviat[ing] the risk of stalling," the MCAS could cause "incorrect pitch down commands to the flight controls and rapid descent into terrain." *Id.* at ¶ 68.

Boeing knew about "egregious" problems with controlling the MAX's pitch, and the MCAS's role in those problems, all the way back in 2013. *Id.* at ¶ 72. Emails from 2013 to 2017 between Boeing and its test pilots confirm that test pilots had reservations about fundamental aspects of the MAX's controls. *Id.* at ¶¶ 72–73.

Despite that knowledge, Boeing "consistently and deliberately failed to disclose and actively concealed the existence of the MCAS and information on how to manage its malfunction . . . because disclosing it would threaten the MAX's certification or . . . result in an immediate grounding of the new planes." *Id.* at ¶ 76. As Plaintiffs tell it, those options were unacceptable because "[t]he MCAS was essential to BOEING's aggressive business plan . . . and BOEING could not compete with Airbus without it." *Id.* at ¶ 86.

Plaintiffs allege that Boeing's drive to compete led to a series of cover-ups of the MAX's design flaws, including serious problems with the MCAS. Boeing failed to test the MCAS adequately during development. *Id.* at ¶¶ 69, 85. Boeing also concealed information about the MCAS during the run up to the launch of the MAX. *Id.* at ¶¶ 72–75.

Boeing withheld information from pilots, too. Boeing provided no information about the MCAS to pilots, including during the training to qualify those pilots to fly the MAX. *Id.* at ¶¶ 75–76, 95–96.

Boeing did include an optional AOA Indicator and Disagree alert as a safety upgrade. In theory, the upgrade would have alerted pilots to pitch-control issues. *Id.* at ¶ 94. But it wasn't enough. The upgrades were "not enough to prevent an accident triggered by the MCAS." *Id.* at ¶¶ 89–95.

4

### *The First Crash*

Disaster struck in 2018. "On October 28, 2018, [Lion Air] Flight JT610 crashed into the Java Sea about 11 minutes after takeoff from Jakarta, Indonesia, killing everyone on board." *Id.* at ¶ 101. The plane was a MAX, and Plaintiffs suggest that the MCAS was to blame for the crash. *Id.* at ¶¶ 88, 101–03.

At the time, Boeing was well aware that the MCAS might pose a danger. *Id.* at ¶ 102. And it was working on a solution. "At least as early as the crash of JT610, Boeing knew and accepted that the MCAS was defective and was secretly working on a software fix to address its defects." *Id.*

After the JT610 crash, Boeing issued a bulletin to MAX pilots titled "TBC-19." It mentioned only "that the MAX's AOA sensors can produce erroneous indications causing the MAX to enter into an aggressive dive." *Id.* at ¶¶ 105–06. But it made no mention of the MCAS.

The crash prompted the Federal Aviation Administration to issue an Emergency Airworthiness Directive, ordering Boeing to correct its omissions. *Id.* at ¶ 107. The FAA ordered Boeing to modify its operating manual to include "specific warnings and instructions on procedures to respond to the symptoms of (but still not explicitly referenced as) an erroneously triggered MCAS." *Id.* at ¶ 108.

The Indonesian Transportation Safety Committee investigated the disaster. It concluded that the crash resulted from "the combination of an improperly aligned AOA sensor, lack of pilot reporting, and training," among other factors. *Id.* at ¶ 110.

### *The Second Crash*

And then, another plane came down.  About five months later, in March 2019, a second Boeing MAX suffered a devasting accident.  *Id.* at ¶ 112.  The flight, Ethiopia Airlines ET302, crashed to the ground shortly after takeoff from Addis Ababa, killing everyone on board.  *Id.*

Boeing attempted to reassure the public by revealing that it had developed a software enhancement to correct the flight-control problems.  *Id.* at ¶ 114.  Even so, the second crash prompted several airlines to voluntarily ground their MAX fleets.  *Id.* at ¶ 118.  Before long, "several major national aviation authorities ordered that MAXs on their territory be grounded." *Id.* at ¶ 119.

As Plaintiffs see it, Boeing's defective design and concealment of the MAX's flaws led to the crashes, and the ensuing grounding of the fleet.  And Boeing should have seen it coming. Long before the disasters, Boeing knew "that the MCAS was defective."  *Id.* at ¶ 102.  Boeing knew "that the AOA Indicator and Disagree alert software link on the MAX display system software was defective," and "that these design flaws . . . likely were responsible for" the sorts of problems that caused the two crashes.  *Id.* at ¶¶ 103, 109.

### *The Pilots*

Plaintiff Mathieu Crye is a pilot for Air Canada.  *Id.* at ¶ 5.  He took training to fly the MAX.  *Id.* at ¶ 6.  But he wasn't on either of the planes that crashed.  The same can be said of Kornél Várhelyi, a pilot for Smartwings (a low-cost Czech airline).  *Id.* at ¶¶ 9–10.  And Gustavo Urtubey, a pilot for Jet Airways (an Indian airline).  *Id.* at ¶ 13.  And the rest of the Plaintiffs.

Plaintiffs believe that they suffered harm, without crashing.  They allege that they lost money when MAX planes were grounded in response to the JT610 and ET302 crashes.  To

understand why, it is necessary to explain a little bit about what it takes to fly a commercial passenger airplane.

### Boeing's Relationship with Pilots

To fly commercially, pilots need both a pilot's license and a certification to fly a specific airplane. A pilot's license is not a license to fly any and all commercial aircraft. Instead, pilots become "certified" (also called "type rated" or "qualified") to fly specific airplanes. *Id.* at ¶¶ 123–25.

The certification process for Boeing planes involves pilots training either "directly at a BOEING training facility with BOEING instructors, or at a third-party training facility with instructors who were trained by BOEING instructors, using information and training materials prepared by BOEING." *Id.* at ¶ 125.

In an ideal world, the relationship is mutually beneficial: pilots gain the skills and credentials necessary to fly a specific plane, and the manufacturer gains a base of trained pilots that makes its airplanes attractive to airline customers. *Id.* at ¶ 121 ("BOEING cultivates a relationship of trust and confidence with BOEING-certified pilots because without their trust and confidence, BOEING would have a much more difficult time selling planes to its airline customers. In other words, without MAX-certified pilots available to fly the planes, BOEING airline customers would not buy the planes.").

Boeing controls the pilot-certification process for its planes. *Id.* at ¶ 127. For example, "BOEING dictates the type of training and the scope of the information provided during training." *Id.* So, Boeing could, and in fact did, decide that pilots already certified to fly a different 737 model could become MAX certified after "review[ing] a brief iPad presentation that was prepared by BOEING." *Id.* This presentation, known as the "CBT," included no

7

information about the MCAS. *Id.* at ¶ 167. Plaintiffs allege that Boeing wanted the certification process to operate as quickly as possible to reduce training costs, expand its base of trained pilots, and thereby increase sales of the MAX. *Id.*

Plaintiffs in this lawsuit are licensed commercial airline pilots currently or formerly employed by a variety of international airlines.[1] *Id.* at ¶ 4. They all made the decision to become MAX-certified pilots.

Plaintiffs went to the trouble of becoming certified to fly the MAX. Certifications for planes are not fungible. "In other words, a pilot rated to fly the BOEING 737, like Plaintiffs, cannot simply switch to flying the BOEING 787 or the Airbus A380." *Id.* at ¶ 170.

The decision to get certified to fly the MAX came with an opportunity cost. "[R]atings must be constantly maintained with additional training and flight time, so that a pilot rated to fly the BOEING 747 who transitions to the 737 will quickly lose their rating on the 747 and not be 'current' to fly the 747." *Id.* at ¶ 171.

Plaintiffs "transitioned to the MAX based on BOEING's representation that it was a safe aircraft that would remain in operation for years." *Id.* at ¶ 172. Plaintiffs allege that, during and after the certification process, they received written materials from Boeing with safety information about the MAX.

---

[1] Plaintiffs include pilots for Air Canada (*see* Third Am. Cplt., at ¶ 5 (Dckt. No. 111)); Smartwings, "a low-cost Czech airline" (*id.* at ¶ 9); Jet Airways, "an Indian international airline" (*id.* at ¶ 13); Norwegian Air International, "an Irish low-cost airline and a fully integrated subsidiary of Norwegian Air Shuttle" (*id.* at ¶ 18); Sunwing Airlines, "a Canadian low-cost airline" (*id.* at ¶ 21); WestJet Airlines, "a low-cost Canadian airline" (*id.* at ¶ 25); Lion Air, "an Indonesian low-cost airline" (*id.* at ¶ 28); Mauritania Airlines, "an airline based in Nouakchott, Mauritania" (*id.* at ¶ 30); TUI AG, "an Anglo-German multinational travel and tourism company that operates an airline headquartered in Hannover, Germany" (*id.* at ¶ 32); Fiji Airways (*id.* at ¶ 34); Oman Air (*id.* at ¶ 36); Icelandair (*id.* at ¶ 39); and Samoa Airways (*id.* at ¶ 42). At least one pilot from all of those airlines seeks to represent proposed classes of other pilots at their respective airlines who were also affected by issues with the MAX. *Id.* at ¶ 4. Finally, the Complaint also includes a proposed class of "Global MAX Pilots," who live "in regions that provide very few protections for 'whistleblowers,'" and thus are not named. *Id.* at ¶ 47.

In particular, Plaintiffs highlight versions of the MAX's Flight Crew Operations Manual ("FCOM"), which is "a 1,500-plus page manual that was prepared by BOEING and periodically revised and updated by BOEING to facilitate the 'safe and efficient' operation of the MAX." *Id.* at ¶ 135. The FCOM and its accompanying bulletins "are direct communications by BOEING to each new pilot wishing to become rated on the aircraft," and "[r]eviewing the FCOM and understanding its contents is required for a pilot to be qualified on the MAX." *Id.* at ¶¶ 136–37.

The FCOM omitted critical information about MCAS and the problems with the MAX's design. Plaintiffs received four different versions of the FCOM throughout 2018 and early 2019, including versions on (1) February 15, 2018, (2) February 21, 2018, (3) June 3, 2018, and (4) January 30, 2019. *Id.* at ¶¶ 141, 147, 154, 157. Boeing sent the last version after the JT610 crash.

Plaintiffs allege that none of the versions of the FCOM included any detail about the MCAS or its associated issues. In fact, Plaintiffs claim that "MCAS" appears in a list of abbreviations in one of the versions of the FCOM (from February 21, 2018), but that it was "never again mentioned" in the manual. *Id.* at ¶ 151. "BOEING provided Plaintiffs with no information about MCAS, how the system operated, or how to manage it in the case of a malfunction." *Id.* Later versions of the FCOM did not provide any information about the system, either. The solitary reference to MCAS was removed in the next two versions. *Id.* at ¶¶ 156, 161.

Even after the crash of JT610, Plaintiffs say that Boeing kept them in the dark about the MAX's real problems. In response to that crash, and in addition to the materials it had already provided, Boeing sent a bulletin called TBC-19 to MAX-certified pilots. *Id.* at ¶ 162. That bulletin explained "that there was a possibility of an 'uncommanded nose down stabilizer trim

due to erroneous Angle of Attack (AOA)' and recommended a procedure to manage it." *Id.* at ¶ 164. But the bulletin did not mention MCAS specifically. *Id.* at ¶ 166.

In Plaintiffs' eyes, that omission was no oversight. It was active concealment of critical safety information about MCAS. Boeing knew that the "recommended procedure was entirely inadequate and would not prevent future crashes of the MAX in the event of another, inevitable, MCAS malfunction." *Id.* at ¶ 164.

The bulletin gave false assurances of safety. It "was calculated by BOEING to assure Plaintiffs that the MAX was safe by concealing information about MCAS." *Id.* at ¶ 165. Boeing "represented by implication" that the MAX "was safe to operate, did not contain design flaws, and would not be grounded." *Id.* at ¶ 166.

In sum, Boeing omitted critical information about the design and safety of the airplane in its training materials, flight operations manual, and pilot bulletin. That omission was no accident. Boeing wanted to cultivate a robust network of MAX-qualified pilots to compete with Airbus.

### *The Economic Losses*

Plaintiffs allege that they suffered an injury from Boeing's defective design and concealment. As they see it, if they had known about the design flaws, they never would have made the investment to become MAX certified. *Id.* at ¶¶ 130, 153. If they had known the full story, "Plaintiffs would never have committed their careers to flying the MAX." *Id.* at 5 of 58 (Introduction).

Instead, Plaintiffs became MAX certified. And when the fleets were grounded, they were stuck with certifications to fly planes stuck on the ground. They couldn't earn a living flying grounded planes.

"When the MAX was grounded, MAX pilots, including Plaintiffs, were suddenly without aircraft to fly or their flying time was reduced or eliminated altogether.  Many of them were terminated and forced to spend significant personal time, effort and finances to train to receive a rating on a different aircraft, including regaining currency on those types flown previously."  *Id.* at ¶ 173.  Some pilots "had to relocate their 'base airport' at their own expense" in response to the disruption in their flying schedules.  *Id.* at ¶ 175.

Plaintiffs lay the blame for their financial losses at Boeing's feet.  They seek compensation for their loss of income, and they advance four tort claims.

The first claim is strict products liability.  Plaintiffs allege that the MAX "was an unreasonably dangerous and defective airplane," and that the defective design caused Plaintiffs to suffer economic losses.  *Id.* at ¶¶ 178–87 (Count I).

The second claim is negligence.  Plaintiffs allege that Boeing negligently "designed and added an unsafe feature to the MAX because adding that feature was a cheap, easy way to mask the airplane's inherent aerodynamic problems."  *Id.* at ¶ 196.  The pilots say that Boeing's negligence "throughout the design, manufacture, and certification process . . . demonstrated time and time again that BOEING knowingly put its financial interests ahead of aviation safety," and that this decision "amounted to gross negligence and demonstrated a wanton disregard for . . . safety."  *Id.* at ¶¶ 188–98 (Count II).

The third claim is fraudulent concealment.  Plaintiffs claim that Boeing "actively and deliberately concealed from Plaintiffs" important information about the MAX's safety and operating systems.  *Id.* at ¶ 205.  They allege that, by concealing the "true condition of the MAX," Boeing misled Plaintiffs, causing them to become MAX certified and eventually leading to their damages.  *Id.* at ¶¶ 199–215 (Count III).

11

The fourth and final claim is fraudulent misrepresentation. Plaintiffs allege that Boeing failed to disclose information about the MCAS in the operations manuals, and failed to provide information necessary to fly the MAX safely. *Id.* at ¶¶ 216–36 (Count IV). Plaintiffs also allege that Boeing represented, on the day when Plaintiffs became qualified to fly the MAX, that they did not need additional training. *Id.* at ¶ 222. Plaintiffs claim that they relied on the representations and omissions by qualifying to operate the MAX. *Id.* at ¶ 228. Once again, Plaintiffs allege that the misrepresentations caused them to suffer a loss of wages. *Id.* at ¶ 236.

## Legal Standard

A motion to dismiss for failure to state a claim challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

The parties agree, for purposes of this motion only, that Illinois tort law governs the Plaintiffs' claims. *See* Def.'s Mem. in Supp. of Mtn. to Dismiss, at 10 n.1 (Dckt. No. 120). When sitting in diversity, the Court "must exercise care and caution" in applying state law. *See Smith v. RecordQuest, LLC*, 989 F.3d 513, 517 (7th Cir. 2021). The Court's task is to determine how the state's highest court would rule, with the decisions of the state's intermediate appellate

12

courts providing controlling guidance "unless there is a convincing reason to predict the state's highest court would disagree." *Id.* (quotation marks omitted).

### Discussion

Boeing moves to dismiss on a number of grounds, some of which apply to more than one claim. First, Boeing moves to dismiss all of the claims for lack of proximate causation. Second, Boeing challenges the strict liability and negligence claims (Counts I and II) under the economic loss doctrine. Third, Boeing argues that the fraudulent concealment claim (Count III) fails because it lacks a fiduciary or special relationship with the pilots. Fourth, Boeing contends that the complaint fails to plead fraudulent misrepresentation (Count IV) with particularity.

The Court will take them up in that order.

### I. Proximate Causation

Boeing moves to dismiss all of the claims for lack of causation. As Boeing sees it, any design flaws did not proximately cause any loss of income allegedly suffered by the pilots. Exactly right.

Before diving into the merits, a threshold question is whether proximate causation is fair game at the motion-to-dismiss stage. Plaintiffs argue that proximate causation is a question for the jury, while Boeing contends that "Illinois courts frequently resolve proximate cause as a matter of law." *See* Def.'s Reply in Supp. of Mtn. to Dismiss, at 9 (Dckt. No. 144).

Under Illinois law, "the lack of proximate cause may be determined by the court as a matter of law where the facts alleged do not sufficiently demonstrate both cause in fact and legal cause." *See City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1128 (Ill. 2004) (citing *Harrison v. Hardin Cnty. Cmty. Unit Sch. Dist. No. 1*, 758 N.E.2d 848, 854 (Ill. 2001) (Harrison, C.J., concurring) ("[W]here the facts are undisputed and reasonable men could not differ as to

the inferences to be drawn from those facts, proximate cause may be determined as a matter of law.")).

In other words, normal standards apply to a motion to dismiss for lack of causation. The Court will not resolve factual disputes at this stage, but when the alleged facts fail to establish proximate causation, then dismissal is appropriate. *See Dundee Cement Co. v. Chem. Lab'ys Inc.*, 712 F.2d 1166, 1168–72 (7th Cir. 1983) (affirming the dismissal of tort claims for lack of proximate causation). There is no point going forward if the theory of the case is doomed. Some defects can't be fixed.

The elements of a tort claim are well-familiar: duty, breach, causation, and damages. A complaint must allege "the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, an injury proximately caused by the breach, and damages." *See Boyd v. Travelers Ins. Co.*, 652 N.E.2d 267, 270 (Ill. 1995).

Illinois courts have explained that causation entails "two distinct requirements: cause in fact and legal cause." *Lee v. Chicago Transit Auth.*, 605 N.E.2d 493, 502 (Ill. 1992). The motion to dismiss involves the second requirement, meaning the legal cause of the injuries.

The first requirement, cause in fact, is present "when there is a reasonable certainty that a defendant's acts caused the injury or damage." *Id.* "When considering cause in fact, courts generally employ either the traditional 'but for' test or the 'substantial factor' test." *Turcios v. DeBruler Co.*, 32 N.E.3d 1117, 1124 (Ill. 2015). "Under the 'but for' test, a defendant's conduct is not the cause of an event if the event would have occurred without it. Under the 'substantial factor' test, the defendant's conduct is said to be a cause of an event if it was a material element and a substantial factor in bringing the event about." *Id.* (cleaned up).

14

The second requirement, legal cause, is more difficult to pin down. For starters, the terminology can get in the way and cause a little trouble. Most of the time, proximate causation is another name for legal cause, meaning that it is a subset of the broader causation inquiry. But Illinois courts use "proximate cause" more broadly as an umbrella term, covering both factual cause and legal cause.

The difference in the legal lingo can trip up a reader, because other courts and treatises often use the term "proximate cause" more narrowly to mean only legal cause. *See, e.g.*, W. Page Keeton *et al.*, Prosser and Keeton on the Law of Torts § 41, at 263 (5th ed. 1984) ("An essential element . . . is that there be some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered. This connection usually is dealt with by the courts in terms of what is called 'proximate cause,' or 'legal cause.'"). For the sake of simplicity, this Court will use the term proximate cause and legal cause interchangeably. That is, this Court will use the term "proximate causation" in a more limited sense to cover only legal causation.

"It is a well-established principle of [the common] law, that in all cases of loss, we are to attribute it to the proximate cause, and not to any remote cause; *causa proxima non remota spectatur*." *Waters v. Merchs.' Louisville Ins. Co.*, 36 U.S. 213, 223 (1837) (Story, J.); *see also Bank of America Corp. v. City of Miami*, 137 S. Ct. 1296, 1305 (2017). But announcing that principle is easier than pinning it down.

"A firm definition for the term 'proximate cause' has escaped judges, lawyers, and legal scholars for centuries." *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 392 (7th Cir. 2018); *see also Paroline v. United States*, 572 U.S. 434, 444 (2014) ("The idea of proximate cause, as distinct from actual cause or cause in fact, defies easy summary."). "There is perhaps nothing in

15

the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion." *See* Keeton *et al.*, *supra*, § 41, at 263; *see also United States v. Gamble*, 709 F.3d 541, 549 (6th Cir. 2013) ("Professors and scholars, lawyers and judges have been tilting at that windmill for generations.").

"[W]e use 'proximate cause' to label generically the judicial tools used to limit a person's responsibility for the consequences of that person's own acts. At bottom, the notion of proximate cause reflects 'ideas of what justice demands, or of what is administratively possible and convenient.'" *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992) (quoting Keeton *et al.*, *supra*, § 41, at 264); *see also Cause*, Black's Law Dictionary (11th ed. 2019) (defining "proximate cause" as a "cause that directly produces an event").

Proximate causation "reflects the reality that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132 (2014) (quotation marks omitted); *see also Laborers Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 235 (2d Cir. 1999) ("The law has wisely determined that it is futile to trace the consequences of a wrongdoer's actions to their ultimate end, if end there is."). "The purpose of the proximate causation requirement . . . is to avoid speculative recovery by requiring a direct relation between the plaintiff's injury and the defendant's behavior." *Supreme Auto Transp., LLC v. Arcelor Mittal USA, Inc.*, 902 F.3d 735, 743 (7th Cir. 2018).

"Courts ask whether the injury is the type of injury that a reasonable person would see as a 'likely result' of his or her conduct, or whether the injury is so 'highly extraordinary' that imposing liability is not justified." *Turcios*, 32 N.E.3d at 1124. For an act to be the proximate cause of a harm, "the injury suffered by the plaintiff must be the natural and not merely a remote

16

consequence of the defendant's act." *Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 746 (Ill. 1994) (quoting *Town of Thornton v. Winterhoff*, 92 N.E.2d 163, 166 (Ill. 1950)).

Relevant considerations include "foreseeability, directness, and the substantiality of the defendant's conduct." *Kemper*, 911 F.3d at 392; *see also Turcios*, 32 N.E.3d at 1124 (noting that "legal cause involves an assessment of foreseeability"). A defendant is not liable for injuries that are "too remote," "purely contingent," or "indirect[]." *Holmes*, 503 U.S. at 268, 271, 274. The proximate-cause requirement "normally eliminates the bizarre." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 536 (1995).

Foreseeability in this context does not mean within the realm of imagination. It is not as broad as it sounds. "The proper inquiry regarding legal cause involves an assessment of foreseeability, in which we ask whether the injury is of a type that a reasonable person would see as a likely result of his conduct." *See Beretta U.S.A. Corp.*, 821 N.E.2d at 1127.

Foreseeability is part of the equation, but it is not the whole ballgame. A claim can fail for lack of proximate causation even if the downstream effects are foreseeable. *See Kraft Chem. Co. v. Illinois Bell Tel. Co.*, 608 N.E.2d 243, 246 (Ill. App. Ct. 1992) ("While courts often refer to remoteness or lack of foreseeability, most cases that preclude a plaintiff from recovering against a defendant for economic losses actually are based on the legal policy that, *regardless of foreseeability*, a certain type of plaintiff should not be able to recover against a negligent defendant.") (emphasis added); *Dundee Cement*, 712 F.2d at 1168; *Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50, 52 (1st Cir. 1985) (Breyer, J.); *Bank of America Corp.*, 137 S. Ct. at 1306 ("As we have explained, proximate cause generally bars suits for alleged harm that is too remote from the defendant's unlawful conduct. . . . [F]oreseeability alone does not ensure the close connection that proximate cause requires.") (cleaned up).

Proximate causation requires a close connection between the act and the injury, with a natural link between the two. Under Illinois law, proximate cause "is established only if the defendant's conduct is so closely tied to the plaintiff's injury that he should be held legally responsible for it." *Beretta U.S.A. Corp.*, 821 N.E.2d at 1127 (quotation marks omitted); *see also Simmons v. Garces*, 763 N.E.2d 720, 732 (Ill. 2002) (same); Keeton *et al.*, *supra*, § 41, at 264 ("As a practical matter, legal responsibility must be limited to those causes which are so closely connected with the result and of such significance that the law is justified in imposing liability. Some boundary must be set to liability for the consequences of any act, upon the basis of some social idea of justice or policy.").

The greater the separation between the conduct and the injury, the less likely that proximate causation can bridge the gap. In some sense, all things are connected. But the law places limits on the ability to blame others for losses. *See Prodromos v. Everen Sec., Inc.*, 906 N.E.2d 599, 611 (Ill. App. Ct. 2009) ("Because the consequences of every action stretch forward endlessly through time and the causes of every action stretch back to the dawn of human history, the concept of proximate cause was developed to limit the liability of the wrongdoer to only those injuries reasonably related to the wrongdoer's actions."); Keeton *et al.*, *supra*, § 41, at 264 ("In a philosophical sense, the consequences of an act go forward to eternity, and the causes of an event go back to the dawn of human events, and beyond."). Maybe "what we do in life echoes in eternity," *see* Gladiator (DreamWorks Pictures & Universal Pictures 2000), but liability does not.

The ripple effects of an act can carry liability only so far. *See Bank of America Corp.*, 137 S. Ct. at 1306. Since time immemorial, when it comes to proximate causation, the "general tendency of the law, in regard to damages at least, is not to go beyond the first step." *Associated*

18

*Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983) (quoting *S. Pac. Co. v. Darnell-Taenzer Lumber Co.*, 245 U.S. 531, 533 (1918) (Holmes, J.)). Liability does not run down the entire line of dominoes.

"A requirement of proximate cause thus serves, *inter alia*, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity." *See Paroline*, 572 U.S. at 445; *see also In re Kinsman Transit Co.*, 338 F.2d 708, 725 (2d Cir. 1964) (Friendly, J.) ("This does not mean that the careless actor will always be held for all damages for which the forces that he risked were a cause in fact. Somewhere a point will be reached when courts will agree that the link has become too tenuous – that what is claimed to be consequence is only fortuity. Thus, if the destruction of the Michigan Avenue Bridge had delayed the arrival of a doctor, with consequent loss of a patient's life, few judges would impose liability.").

Proximate causation is reminiscent of the well-known "butterfly effect." Under chaos theory, maybe the flapping of butterfly wings can, in some small way, influence a storm. But we don't hold butterflies liable for hurricanes. Or, as Justice Scalia colorfully put it: "Life is too short to pursue every human act to its most remote consequences; 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action against a blacksmith." *Holmes*, 503 U.S. at 287 (Scalia, J., concurring in the judgment).

The law about proximate causation does not overflow with easy-to-apply rules of thumb. But here's one. If someone is trying to recover damages based on misfortune suffered by a stranger, it is a good sign that the chain of causation is a little too long, and a little too weak. *See Lexmark*, 572 U.S. at 133 ("Put differently, the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct. That is ordinarily

19

the case if the harm is purely derivative of misfortunes visited upon a third person by the defendant's acts.") (quotation marks omitted); *Holmes*, 503 U.S. at 268–69 ("[A] plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts was generally said to stand at too remote a distance to recover."); *Associated Gen. Contractors of Cal.*, 459 U.S. at 532 n.25 (citing the "general principle" that "*[w]here the plaintiff sustains injury from the defendant's conduct to a third person, it is too remote*") (emphasis and brackets in original) (quotation marks omitted); *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303, 309 (1927) (Holmes, J.) ("[N]o authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tort-feasor liable to another merely because the injured person was under a contract with that other unknown to the doer of the wrong. The law does not spread its protection so far.") (citation omitted).

Ultimately, the "question is one of policy – How far should a defendant's legal responsibility extend for conduct that did, in fact, cause the harm?" *Beretta U.S.A. Corp.*, 821 N.E.2d at 1127. "An overturned lantern may burn all Chicago. We may follow the fire from the shed to the last building. We rightly say the fire started by the lantern caused its destruction. A cause, but not the proximate cause. What we do mean by the word 'proximate' is, that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics." *See Palsgraf v. Long Island R.R. Co.*, 162 N.E. 99, 103 (N.Y. 1928) (Andrews, J., dissenting).

This case is a textbook illustration of how a theory of liability can stretch causation too far. The first thing that jumps out from the complaint is the number of links in the causal chain. Plaintiffs allege that Boeing designed a defective plane, which led to crashes, which led

governments and airlines to ground the MAX fleet, which led to a loss of job opportunities, which led to a loss of income for the pilots.

Typically, damages do not "go beyond the first step." *Associated Gen. Contractors of Cal.*, 459 U.S. at 534 (quotation marks omitted). But here, Plaintiffs put forward a theory with a hop, a skip, and a jump, and then some. Liability is a bridge too far.

Plaintiffs are attempting to capitalize on plane crashes experienced by other people. When the first plane came down, and crashed into the Java Sea, Plaintiffs suffered no harm. They woke up the next morning. They had their lives, their property, and their livelihoods. And when the second plane came down, smashing into the ground in Ethiopia, Plaintiffs suffered no injury. They went about their day.

The people on the planes suffered from the plane crashes. They lost everything. Plaintiffs, thankfully, weren't on those planes. They suffered no loss of life or limb. They didn't lose any property, either. Unlike the poor people on those planes, Plaintiffs had everything, and they lost nothing.

Stretching causation to cover people who weren't on the planes would expand the boundaries of liability much too far. It is foreseeable that a defective plane might not fly. And it is natural to think that a defective design might cause accidents. But when you think about a defective plane, and the problems that could ensue, lost income by people who don't crash probably isn't at the top of the list.

Maybe, as a thought experiment, you can imagine how a defective plane could have impacts rippling through the industry. Even so, that's not the first thing that comes to mind when you think about the bad things that could happen from a defective plane. It is unnatural and indirect, at best. If you played "Family Feud," and the category was "Bad Things that Can

21

Happen from a Defective Design of a Plane," answering "a loss of income by pilots who don't crash" wouldn't get you a lot of points, but it would get you a lot of blank stares from the other members of your team.

Case law confirms that Plaintiffs are too far removed from the design defect to bring a claim. In *Dundee Cement Co. v. Chemical Laboratories, Inc.*, 712 F.2d 1166 (7th Cir. 1983), the Seventh Circuit addressed a claim by a company that was affected by someone else's car accident. A truck carrying flammable liquid overturned on a highway, leading to the closure of the road. The Dundee Cement Company claimed that it lost business as a result of the spill, because customers could not access their business and load up their trucks.

The Seventh Circuit affirmed the dismissal of the claim. The possible loss of income to nearby businesses like Dundee was, in some sense, a foreseeable result of the accident. "[O]ne could easily foresee that an accident that forced a road to close and that therefore blocked all access to a company could seriously inconvenience that company." *Id.* at 1168.

Even so, the Seventh Circuit held that the cement company's losses were too remote from the accident, because it suffered no direct harm. "The type of plaintiff generally precluded from recovering is the third party who suffers no physical damage to person or property, but who claims harm as a result of injury to the person or property of another." *Id.* Illinois law bars recovery "where economic loss alone is alleged and where there is no special relationship among the parties or between the plaintiff and the injured property of another." *Id.* at 1169.

A tortfeasor is not "an insurer for the economic losses suffered by the people inconvenienced by his negligent action." *Id.* at 1171–72. A different approach could lead to "staggering," "crippling," "crushing," and "virtually open-ended liability." *Id.* at 1171. "[T]here is a legitimate fear that a crushing burden of litigation would result from allowing recovery for

22

economic damages like this.  The multiversant possibilities of such litigation are staggering to the imagination."  *Id.* at 1172.

The Illinois Appellate Court encountered a similar situation in *Kraft Chemical Co. v. Illinois Bell Telephone Co.*, 608 N.E.2d 243 (Ill. App. Ct. 1992).  There, a chemical company sued a construction company that severed a telephone cable, causing local telephone service to go out for a day.  *Id.* at 244.  The chemical company alleged that it couldn't operate its business without telephone service, and that it lost money as a result.  *Id.*  It represented a class of thousands of users in suburbia.

The Illinois Appellate Court rejected the claim for lack of proximate causation.  The chemical company's injuries were too far removed from the construction company's alleged negligence.  *Id.* at 246–47.  "[A]s a matter of law, the damages sought by plaintiff for the day-long cessation of service to an indeterminate class of plaintiffs are too remote to permit recovery."  *Id.* at 247.

Cases around the country toe the same line.  In *In re Kinsman Transit Co.*, 388 F.2d 821, 822 (2d Cir. 1968) ("*Kinsman II*"), the Second Circuit confronted "misadventures leading to . . . catastrophe" on the Buffalo River one wintry night.  A large ship broke loose from its moorings, and then careened down the river.  It struck another vessel, breaking it loose, and both of them drifted downstream.  They crashed into a bridge, which then collapsed.  The two ships then formed a dam, causing "extensive flooding and an ice jam reaching almost 3 miles upstream."  *Id.*

Nothing could move on the river for months.  Other ships – much like the 737 MAX – were grounded.  Carriers suffered losses as a result of the grounding.  One of those carriers,

Cargill, could not move and unload hundreds of thousands of bushels of wheat, causing significant losses.

Cargill filed suit to recover its losses, but the Second Circuit dismissed the claim. "[T]he injuries to Cargill and Cargo Carriers were too 'remote' or 'indirect' a consequence of defendants' negligence." *Id.* at 824. There must be a "point at which a defendant should no longer be held legally responsible for damage cause[d] 'in fact' by his negligence. Such limiting principles must exist in any system of jurisprudence for cause and effect succeed one another with the same certainty that night follows day and the consequences of the simplest act may be traced over an ever-widening canvas with the passage of time." *Id.* (citation omitted).

In *Barber Lines A/S v. M/V Donau Maru*, 764 F.2d 50 (1st Cir. 1985), the First Circuit addressed an oil spill by a cargo ship in Boston Harbor. The spill prevented another ship from docking at a nearby pier, so it had to unload elsewhere at a higher cost. The owners of that ship sued the ship involved in the spill, seeking to recover "for a financial injury caused by defendants' negligence." *Id.* at 51.

In an opinion by then-Judge Breyer, the First Circuit held that the ship owners could not recover "purely financial" losses "without accompanying physical harm to person or property." *Id.* Courts widely "refuse to hold a defendant liable for negligently caused financial harm without accompanying physical injury or other special circumstances." *Id.* at 53.

The fact that the injury was foreseeable did not move the needle. Judge Breyer drew a "legal line, based on considerations of policy, that forbids compensation for certain types of foreseeable, negligently caused, financial injury." *Id.* at 52 (citation omitted). "We assume that the injury was foreseeable. Nonetheless controlling case law denies that a plaintiff can recover damages for negligently caused financial harm, even when foreseeable, except in special

24

circumstances. There is present here neither the most common such special circumstance – physical injury to the plaintiffs or to their property – nor any other special feature that would permit recovery." *Id.*

The case at hand fits comfortably within that body of case law. *Dundee Cement*, *Kraft*, *Kinsman II*, and *Barber* involved claims by people who suffered remote, indirect, downstream injuries, and attempted to recover their economic losses. In each case, courts rejected attempts to recover purely financial losses suffered as a byproduct of someone else's accident. A failure to establish proximate causation "is the usual result in cases where the only injury complained of from a collision or other physical harm is a business injury involving no physical harm to the plaintiff or his property." *See* William M. Landes & Richard A. Posner, The Economic Structure of Tort Law 251 (1987).

Plaintiffs offer an all-consuming theory of the case with no apparent stopping point. If the pilots could recover, what about the flight attendants? *See Christensen v. Boeing Co.*, 2021 WL 83548 (N.D. Ill. 2021) (granting a motion to dismiss a claim about the MAX by flight attendants for lack of proximate causation). What about the baggage handlers? Other airport workers? And what about the countless other people affected by the loss of flights – passengers, airport concessionaires, taxi drivers, hotel operators, and so on?

Plaintiffs' theory, if adopted, would break free and create havoc. It could not be contained within the boundaries of this particular incident involving the MAX. Consider, for example, a product recall – maybe a recall involving fresh produce, or a car, or medicine, or who knows what. Can everyone who suffers an economic injury as a result of a product recall sue? Compensating the buyers of a defective product is one thing. Forcing the manufacturer to compensate everyone affected, one way or the other, by the defect is something else.

25

It does not take much imagination to envision how Plaintiffs' theory would lead to a tidal wave of liability, as the effects of an incident ripple through the economy. What if a car is recalled because of a defect? Can every owner of the car sue to recover their economic losses from the loss of an ability to drive? And taking it a step further, can an employee of a car dealership sue the manufacturer, based on a loss of sales? And, what if there is a lettuce recall because of E. coli? Can a waiter sue the farm, because the sale of fewer salads led to less tips?

It wouldn't stop there. What about a traffic jam caused by negligent driving on an interstate? *Cf. Barber*, 764 F.2d at 54 ("The number of persons suffering foreseeable financial harm in a typical accident is likely to be far greater than those who suffer traditional (recoverable) physical harm. The typical downtown auto accident, that harms a few persons physically and physically damages the property of several others, may well cause financial harm (e.g., through delay) to a vast number of potential plaintiffs."). Can every inconvenienced driver in the snarled line of traffic recover their economic losses? What about a fire at a warehouse, or a factory? Can everyone who has to go without those products sue for lost profits?

And so on. The universe of potential plaintiffs would stretch far and wide, creating debilitating liability and over-deterring the negligent conduct. *Id.* ("To use the notion of 'foreseeability' that courts use in physical injury cases to separate the financially injured allowed to sue from the financially injured not allowed to sue would draw vast numbers of injured persons within the class of potential plaintiffs in even the most simple accident cases . . . . That possibility – a large number of different plaintiffs each with somewhat different claims – in turn threatens to raise significantly the cost of even relatively simple tort actions."); Dan B. Dobbs *et al.*, The Law of Torts § 199 (2d ed. 2022) ("Without such a limit, liability, they say, would go on forever, one harm leading endlessly to others. The negligently made vacuum requires a trip to

the repair shop, which leads the user to an auto accident, which leads to medical attention, which leads to another injury, which leads to loss of a job, and so on, more or less without end."). We all would be plaintiffs.

Plaintiffs' theory of the case has no discernible limiting principle. Life is full of surprises, and many of the surprises are unpleasant. Product recalls, data breaches, power outages, accidents, traffic jams, supply-chain disruptions, explosions, implosions, and other inconveniences and calamities are an unavoidable part of modern life. The effects may be real. But the common law has never allowed everyone affected by someone else's accident to recover their economic losses.

If recovery is possible after the fall of the first domino, it is hard to see where the line of dominoes will stop falling. It would lead to liability "in an indeterminate amount for an indeterminate time to an indeterminate class." *Ultramares Corp. v. Touche*, 174 N.E. 441, 444 (N.Y. 1931) (Cardozo, J.). "[T]here is a legitimate fear that a crushing burden of litigation would result from allowing recovery for economic damages like this." *Dundee Cement*, 712 F.2d at 1172; *see also Barber*, 764 F.2d at 55 ("And, liability for pure financial harm, insofar as it proved vast, cumulative and inherently unknowable in amount, could create incentives that are perverse."). And here, the pilots are too many dominoes down the line.

Sometimes bad things happen to other people, and it affects you too, in a roundabout, indirect, downstream way. That's life. That's not a claim. The motion to dismiss for lack of proximate causation is granted.

## II.      Economic Loss Doctrine

Another insurmountable obstacle stands in the way of the strict liability and negligence claims. Plaintiffs claim that they suffered economic losses after their employers grounded the

27

737 MAX.  But under Illinois law, a plaintiff cannot bring negligence or strict liability claims for purely economic losses.  The economic loss doctrine is a second, independent basis for dismissal of the strict liability and negligence claims.

Illinois law has familiar rules for tort claims about economic losses.  Decades ago, the Illinois Supreme Court held that plaintiffs cannot recover for a "solely economic loss" in an action for strict liability or negligence.  *See Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443, 449–50 (Ill. 1982).  "The *Moorman* holding is bottomed upon the theory that tort law affords a remedy for losses occasioned by personal injuries or damage to one's property, but contract law and the Uniform Commercial Code offer the appropriate remedy for economic losses occasioned by diminished commercial expectations not coupled with injury to person or property."  *In re Illinois Bell Switching Station Litig.*, 641 N.E.2d 440, 444 (Ill. 1994).

Originally, the economic loss doctrine restricted tort liability between parties who had already entered into a contract covering the same ground.  *See Cmty. Bank of Trenton v. Schnuck Mkts., Inc.*, 887 F.3d 803, 813 (7th Cir. 2018) ("For more than fifty years, state courts have generally refused to recognize tort liabilities for purely economic losses inflicted by one business on another where those businesses have already ordered their duties, rights, and remedies by contract.  The reason for this rule is that liability for purely economic loss is more appropriately determined by commercial rather than tort law, *i.e.*, by the system of rights and remedies created by the parties themselves.") (cleaned up).

Over the years, the doctrine has evolved to cover strict liability and negligence claims about economic losses, even if the parties didn't have a contractual relationship.  In Illinois, "*Moorman* was the first case to stand for the *broader proposition* that purely economic damages cannot be recovered in tort."  *Mars, Inc. v. Heritage Builders of Effingham, Inc.*, 763 N.E.2d 428,

433 (Ill. App. Ct. 2002) (emphasis added); *see also In re Chicago Flood Litig.*, 680 N.E.2d 265,

274 (Ill. 1997) ("At common law, solely economic losses are generally not recoverable in tort

actions."). The Seventh Circuit has applied *Moorman* to bar tort claims where the plaintiff

sought solely economic damages and had not entered a contract with the defendant. *See Dundee*

*Cement*, 712 F.3d at 1169–70.

Economic losses caused by defective products fall within the doctrine, too. Under "the

economic loss doctrine, a products liability plaintiff cannot recover for solely economic loss

under the tort theories of strict liability, negligence, or innocent misrepresentation." *Westfield*

*Ins. Co. v. Birkey's Farm Store, Inc.*, 924 N.E.2d 1231, 1242 (Ill. App. Ct. 2010). "The

economic loss doctrine denies a tort remedy for product defects when the loss is rooted in

disappointed contractual or commercial expectations." *Am. United Logistics, Inc. v. Catellus*

*Dev. Corp.*, 319 F.3d 921, 926 (7th Cir. 2003) (quotation marks omitted). And "[r]ecovery in

tort for disappointed commercial expectations due to breach of implied duties and warranties

between *non-contracting parties* is also barred by the economic loss doctrine." *Id.* (emphasis

added).

Simply put, under Illinois law, "one cannot obtain purely economic damages in an action

sounding in negligence or strict liability in tort." *Jett8 Airlines, PL v. Gen. Elec. Co.*, 2014 WL

5488054, at *2 (Ill. App. Ct. 2014). Illinois courts require that "[t]o recover in tort under the

economic loss doctrine, a party must show harm above and beyond a party's contractual *or*

*commercial expectations*." *Am. United Logistics*, 319 F.3d at 926 (emphasis added). That is,

Illinois law requires personal injury or physical damage to property – a *physical* harm to a person

or an object – to recover economic losses. *See Moorman*, 435 N.E.2d at 451. The economic loss

doctrine "bars liability in a suit for lost profits resulting from negligence in carrying out a

29

commercial undertaking." *Rardin v. T&D Mach. Handling, Inc.*, 890 F.2d 24, 28 (7th Cir. 1989). Cases in this area are legion. *See, e.g.*, *Westfield Ins. Co.*, 924 N.E.2d at 1242 (collecting cases).

Much like the rationale behind proximate causation, "[o]ne of the policies behind the economic loss rule is the recognition that the economic consequences of any single accident are virtually limitless. . . . The economic loss rule avoids the consequences of open-ended tort liability." *In re Chicago Flood Litig.*, 680 N.E.2d at 274. "Absent injury to a plaintiff's person or property, a claim presents an economic loss not recoverable in tort." *Id.* at 276. Proximate causation and the economic loss doctrine drive toward the same concept: liability has limits.

This case falls squarely within the economic loss doctrine. The complaint alleges that the pilots suffered purely economic losses, which under *Moorman* include "consequent loss of profits" from a defective product. *Redarowicz v. Ohlendorf*, 441 N.E.2d 324, 327 (Ill. 1982) (quotation marks omitted). Plaintiffs seek compensation for lost flying time and wages, as well as the emotional injuries that they allegedly suffered in the wake of their professional upheaval. *See* Third Am. Cplt., at ¶¶ 187, 198 (Dckt. No. 111).

Plaintiffs were not on the planes that crashed, so they cannot seek damages for physical injuries. They did not have a property interest in the planes that crashed, either. They simply seek to recover, in tort, downstream economic losses. Under Illinois law, that's a non-starter. The economic loss doctrine stands in the way of the strict liability and negligence claims.

*Moorman* rests on the principle that contract, rather than tort law, provides the proper remedy for defective products that cause only economic losses. *See Moorman*, 435 N.E.2d at 448–49. Here, Boeing presumably had contractual obligations to the airlines that purchased the planes. But Boeing had no contractual relationship with the employees of the airlines, and thus

had no contractual duty. Tort law does not bridge the gap and backfill a duty for purely economic losses. *See, e.g.*, *Johnson Prod. Co. v. Guardsmark, Inc.*, 1998 WL 102687, at *9 (N.D. Ill. 1998) ("The manufacturer of a defective product that simply does not work properly does not owe a duty in tort to the purchaser of the product to use reasonable care in producing the product. Rather, the purchaser's remedy lies in breach of contract or breach of warranty.").

Plaintiffs make a few arguments in an attempt to skirt around the economic loss doctrine. They focus on a few exceptions to the *Moorman* doctrine. *See* Pls.' Resp. to Mtn. to Dismiss, at 18–19 (Dckt. No. 141).

There are "three exceptions to the *Moorman* doctrine: '(1) where the plaintiff sustained damage, i.e. personal injury or property damage, resulting from a sudden or dangerous occurrence; (2) where the plaintiff's damages are proximately caused by a defendant's intentional, false representation, i.e. fraud; and (3) where the plaintiff's damages are proximately caused by a negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions.'" *ExxonMobil Oil Corp. v. Amex Constr. Co.*, 702 F. Supp. 2d 942, 968 (N.D. Ill. 2010) (quoting *In re Chicago Flood Litig.*, 680 N.E.2d at 275).

Plaintiffs argue that the first and the third exceptions apply, and thus come to the rescue of the strict liability and negligence claims (Counts I & II). The parties do not discuss the second exception, which governs fraud claims. That omission is not surprising. The economic loss doctrine does not apply to fraud claims, and thus does not knock out Plaintiffs' claims for fraudulent concealment and fraudulent misrepresentation (Counts III & IV). *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 568–69 (7th Cir. 2012).

The first exception does not apply. Plaintiffs argue that they suffered damage to their property interests because the value of their pilots' licenses and MAX certifications has decreased. *See* Pls.' Resp. to Mtn. to Dismiss, at 17 (Dckt. No. 141). That is not what property damage means in this context.

*Moorman* requires "physical damage" to property to bring a negligence or strict liability claim, not simply a legally cognizable interest in the property. *See Moorman*, 435 N.E.2d at 451 (explaining that where there is "no physical damage, and the only loss is a pecuniary one, through loss of the value or use of the thing sold . . . the courts have adhered to the rule that purely economic interests are not entitled to protection against mere negligence, and so have denied the recovery").

When a plaintiff has suffered diminished commercial expectations, rather than physical damage, *Moorman*'s economic loss rule bars recovery. *See In re Chicago Flood Litig.*, 680 N.E.2d at 274 (explaining that *Moorman* bars "from recovery those plaintiffs who did not allege physical property damage, but rather only economic loss"); *Bd. of Educ. v. A, C & S, Inc.*, 546 N.E.2d 580, 587 (Ill. 1989) (confirming "the necessity of physical damage to other property or personal injury" for recovery in tort); *see also Donovan v. County of Lake*, 951 N.E.2d 1256, 1265 (Ill. App. Ct. 2011) (applying the economic loss doctrine where the plaintiffs failed to allege "actual property loss that was above and beyond their disappointed commercial expectations").

And here, that's all there is. Plaintiffs did not suffer a physical loss of their licenses or their MAX certifications. The licenses and certifications did not go up in smoke. Instead, Plaintiffs allege that they suffered an economic harm from a decline in the value of their licenses and certifications. That type of pecuniary injury is not compensable under *Moorman*.

The third exception does not apply, either. Boeing is not in "the business of supplying information for the guidance of others in their business transactions." *In re Chicago Flood Litig.*, 680 N.E.2d at 275. It is in the business of making airplanes.

Lower courts in Illinois have held that Boeing is not "in the business of supplying information." *Jett8 Airlines, PL v. Boeing Co.*, 2012 WL 5815728 (Ill. Cir. Ct. 2012), *aff'd on other grounds*, 2014 WL 5488054 (Ill. App. Ct. 2014); *see also Christensen*, 2021 WL 83548, at *3 (applying *Jett8* and holding that Boeing is not in the business of supplying information). Even though Boeing provides "information in [its] operation and maintenance manuals, service bulletins and other communications," that information is "merely ancillary to the tangible good provided." *Jett8 Airlines*, 2012 WL 5815728 (omitting page numbers). The information that Boeing provides "relates to the good that [it] provide[s]" and "simply [is] not central" to the sale of its planes. *Id.*

Instead, "manufacturers of products of any type" are "[a]t the tangible product end" of "a continuum [of enterprises] with pure information providers at one end and pure tangible good providers at the other." *Tolan & Son, Inc. v. KLLM Architects, Inc.*, 719 N.E.2d 288, 296–97 (Ill. App. Ct. 1999) (quotation marks omitted). For manufacturers like Boeing, "[t]he end result of the enterprise is some sort of tangible object," not the provision of information. *Id.* at 297.

Plaintiffs have run out of exceptions, and hit the end of the road. Even so, Plaintiffs attempt to carve out a new exception to the economic loss doctrine. Plaintiffs argue that there is a "special relationship" between Boeing and MAX-certified pilots that creates a separate exception to Illinois's economic loss rule. Plaintiffs emphasize that Boeing has special knowledge and expertise about the design of its planes and the training required to fly them. *See* Pls.' Resp. to Mtn. to Dismiss, at 18–19 (Dckt. No. 141).

33

Plaintiffs are mixing and matching legal doctrines, cutting cases about fraudulent concealment and the duty to warn and then pasting them into an argument about the economic loss doctrine. *See, e.g.*, *Iseberg v. Gross*, 879 N.E.2d 278, 285 (Ill. 2007) (duty to warn); *Schrager v. N. Cmty. Bank*, 767 N.E.2d 376, 386 (Ill. App. Ct. 2002) (fraudulent concealment). Suffice it to say that the economic loss doctrine under Illinois law does not recognize an exception for special relationships.

This case would not be a good candidate to create such an exception, either. Illinois law recognizes special relationships only "where [the] plaintiff places trust and confidence in [the] defendant, thereby placing [the] defendant in a position of influence and superiority over plaintiff." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996). Absent some legally recognized relationship (like attorney-client or fiduciary-beneficiary), special relationships exist only in rare circumstances. The disparity between the parties must be stark – "asymmetric information alone does not show the degree of dominance needed to establish a special trust relationship." *Wigod*, 673 F.3d at 573.

Selling airplanes isn't one of these rare circumstances. *See Go For It, Inc. v. Aircraft Sales Corp.*, 2003 WL 21504600, at *2 (N.D. Ill. 2003) (finding no confidential relationship in the sale of an airplane because "the parties' relationship did not possess sufficient indicia of disparity in experience or knowledge such that defendants could be said to have gained influence and superiority over the plaintiff" because "a slightly dominant business position does not operate to turn a formal, contractual relationship into a confidential or fiduciary relationship").

Boeing doesn't have a special relationship with any of the Plaintiffs. In fact, before this lawsuit, Boeing undoubtedly didn't even know who they were. That's not a special relationship. That's no relationship.

34

Plaintiffs point to language from the Seventh Circuit's opinion in *Dundee Cement*, stating that "Illinois has recognized a limited exception to the rule of nonliability when there is a special relationship between a negligent party and a third party who is economically injured." *See Dundee Cement*, 712 F.2d at 1169. But the ensuing citation confirms that the Seventh Circuit was not blowing a hole in Illinois law. The Seventh Circuit cited an Illinois case involving "an action against an attorney for negligence in preparing wills." *Id.* at 1170 (citing *Ogle v. Fuiten*, 445 N.E.2d 1344 (Ill. App. Ct. 1983)). An attorney giving legal advice about the contents of a will is a textbook example of a person "in the business of supplying information for the guidance of others." *In re Chicago Flood Litig.*, 680 N.E.2d at 275. So it fit within the third exception under *Moorman*.

In sum, the Court grants the motion to dismiss the strict liability and negligence claims (Counts I & II) based on the economic loss doctrine.

## III.    Fraudulent Concealment

The third claim is fraudulent concealment. Boeing advances an argument that provides an independent ground for dismissal of that claim, above and beyond the lack of proximate causation.

To prove fraudulent concealment, Plaintiffs must show that they entered into a special or fiduciary relationship with Boeing. Boeing argues that it had no such relationship with the pilots. The Court agrees.

"To plead [fraudulent concealment] properly, in addition to meeting the elements of fraudulent misrepresentation, a plaintiff must allege that the defendant intentionally omitted or concealed a material fact that it was under a duty to disclose to the plaintiff." *Wigod*, 673 F.3d at 571 (citing *Weidner v. Karlin*, 932 N.E.2d 602, 605 (Ill. App. Ct. 2010)). Under Illinois law

"[t]o prove fraud by the omission of a material fact, it is necessary to show the existence of a special or fiduciary relationship." *Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, 936 F. Supp. 2d 933, 945–46 (N.D. Ill. 2013). To establish the existence of a special relationship giving rise to a duty to disclose, "the defendant must be clearly dominant, either because of superior knowledge of the matter derived from . . . overmastering influence on the one side, or from weakness, dependence, or trust justifiably reposed on the other side." *Wigod*, 673 F.3d at 572. Illinois courts have "rarely found a special trust relationship in the absence of a more formal fiduciary one." *Id.*

Plaintiffs argue that they had a "special relationship" with Boeing that created a duty to disclose information about the safe operation of the MAX. *See* Pls.' Resp. to Mtn. to Dismiss, at 26–27 (Dckt. No. 141). They contend that a special relationship "arises less formally in situations where a plaintiff places trust and confidence in a defendant, and the defendant thereby assumes a position of influence or superiority over the plaintiff." *Id.* at 26. Plaintiffs cite three cases for support, but they don't lend much of a hand.

Plaintiffs first cite *Guarantee Trust Life Insurance Co. v. Kribbs*, 68 N.E.3d 1046 (Ill. App. Ct. 2016). But *Kribbs* did not hold that the parties were in the type of "special relationship" that required absolute openness. *Id.* at 1056–57. Instead, it considered a traditional employer-employee fiduciary relationship. *Id.* at 1056.

There, an insurance company sued two employees who allegedly were part of a scheme to steal premium payments held for reinsuring insurance policies. *Id.* at 1049–50. Evaluating the insurance company's fraudulent concealment claim, the Illinois Appellate Court noted that although employers and employees are in a fiduciary relationship, "the caselaw suggests that

36

employees owe duties of fidelity and loyalty to their employers; not necessarily a duty of candor." *Id.* at 1057.

That is, the employees didn't have a duty to speak. The court went on to say that, even if the defendant employees "were fiduciaries who owed Guarantee a duty of candor," a lack of causation would have blocked the plaintiff's claim anyway. *Id.*

In other words, the case did not hold that employers and employees always have the kind of "special relationship" needed to support a fraudulent concealment claim. And even if it had, Plaintiffs and Boeing aren't in an employer-employee relationship, so *Kribbs* is not on point.

Plaintiffs' other two cases involved situations where the Illinois courts did find a special relationship, but the facts of those cases lie very far afield. *See* Pls.' Resp. to Mtn. to Dismiss, at 26 (Dckt. No. 141) (citing *Winiewski v. Diocese of Belleville*, 943 N.E.2d 43, 74 (Ill. App. Ct. 2011); *Doe v. Boy Scouts of Am.*, 66 N.E.2d 433, 457 (Ill. App. Ct. 2016)). Both involved the sexual abuse of children by members of large organizations operating in positions of authority and influence over the children. That's not even close to the situation here.

Plaintiffs' theory would have wide-ranging implications, swallowing up everything in its path. Lots of companies have a position of "influence or superiority," in one way or another. Think about any run-of-the-mill relationship between a manufacturer and a consumer: car companies, pharmaceutical companies, and so on. In some sense, they have influence and superiority, but not in the sense that could give rise to a special relationship. Otherwise, special relationships would appear all over the place – the relationships would be so prevalent that they would cease to be special.

That reality helps to explain why courts have rejected attempts to impose a special relationship based on disparate knowledge or expertise alone. *See, e.g.*, *Flynn v. FCA US LLC*,

327 F.R.D. 206, 218 (S.D. Ill. 2018) (finding "no evidence" and "no developed argument" demonstrating that "an automobile manufacturer, or a component manufacturer for an automobile manufacturer, and a consumer who purchases from a dealership are engaged in a fiduciary or special trust relationship"); *Noah v. Enesco Corp.*, 911 F. Supp. 299, 303 (N.D. Ill. 1995) (finding no special relationship between a craftsman and "the country's largest giftware manufacturer," whose advice he sought concerning a product).  Plaintiffs point to nothing suggesting that the Illinois Supreme Court would adopt a more expansive notion of a special relationship.

In sum, Plaintiffs and Boeing did not have a fiduciary or special relationship, so the fraudulent concealment claim fails as a matter of law.

## IV.    Fraudulent Misrepresentation

The last claim is fraudulent misrepresentation.  Plaintiffs allege that Boeing represented that the MAX was safe, and failed to disclose design defects.  The claim suffers from a number of problems.

Under Illinois law, a fraudulent misrepresentation claim requires "(1) a false statement or omission of material fact; (2) knowledge or belief of the falsity by the party making it; (3) intention to induce the other party to act; (4) action by the other party in reliance on the truth of the statements; and (5) damage to the other party resulting from such reliance."  *Weidner*, 932 N.E.2d at 605.

"The paradigmatic example of a fraudulent misrepresentation is a false statement rather than an omission."  *Pactiv LLC v. Perez*, 2020 WL 7123070, at *8 (N.D. Ill. 2020).  But an omission also can give rise to a fraudulent misrepresentation claim, in limited circumstances. *Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 622 (Ill. App. Ct. 1995).  For

example, a special or fiduciary relationship can give rise to a duty to speak. *See Weidner*, 932 N.E.2d at 605; *Lidecker v. Kendall College*, 550 N.E.2d 1121, 1126 (Ill. App. Ct. 1990).[2]

Another example involves half-truths. *See Integrated Genomics, Inc. v. Gerngross*, 636 F.3d 853, 863 (7th Cir. 2011) (citing *Williams*, 654 N.E.2d at 622) ("[A] false statement may include a half-truth which, although technically accurate, is misleading because it omits important qualifying information that, had it been known, would have caused the plaintiff to act differently."). The concept about half-truths is analogous to securities law – sometimes a speaker says something, but fails to mention facts necessary to make the statement not misleading. And in that situation, the half-truth can give rise to a claim.

It is not enough to allege a failure to speak, because there is no freewheeling duty to speak. A complaint must allege a duty to speak the truth, either because of the nature of the relationship, or because the speaker already said something that omitted the full story.

Another element of a fraudulent misrepresentation claim is reliance. "[T]he reliance upon the misrepresentation must have been justified, *i.e.*, the other party had a right to rely upon the statement." *Doe v. Dilling*, 888 N.E.2d 24, 36 (Ill. 2008). "Under Illinois law, justifiable reliance exists when it was reasonable for plaintiff to accept defendant's statements without an independent inquiry or investigation." *Wigod*, 673 F.3d at 569 (quotation marks omitted).

---

[2] It is not entirely clear how much daylight there is between a fraudulent concealment claim and a fraudulent misrepresentation claim when the speaker says nothing at all, meaning that it involves a pure omission. Illinois courts seem to cite fraudulent concealment cases and fraudulent misrepresentation cases back and forth, which blurs the line between the claims. *See, e.g.*, *Weidner*, 932 N.E.2d at 605. A case involving silence by the defendant – meaning a pure omission, without any statement by the defendant – seems better suited for a fraudulent concealment claim than a fraudulent misrepresentation claim. A fraudulent misrepresentation claim when there is no representation at all feels like an oxymoron, better suited to a Monty Python sketch. But maybe it depends on the overall context. And in any event, an omission can give rise to a fraudulent misrepresentation claim when the defendant did say something, but failed to tell the whole truth. That's a half-truth, and a half-truth is a classic misrepresentation because the speaker said something that was inaccurate or misleading.

"In the common law tort of fraudulent misrepresentation, the causal link between the wrongdoer and the damage to the plaintiff is provided by the concept of reliance." *Oliveira v. Amoco Oil Co.*, 776 N.E.2d 151, 161 (Ill. 2002) (quoting Restatement (Second) of Torts § 546, cmt. a (1977)). This causal link also requires a showing of proximate cause. *See Phillips v. DePaul Univ.*, 19 N.E.3d 1019, 1036 (Ill. App. Ct. 2014) (affirming dismissal of a fraudulent misrepresentation claim because "plaintiffs failed to adequately allege proximate cause"); *Martin*, 643 N.E.2d at 742 ("It has also been noted by our appellate court that proximate cause must be shown in actions for intentional misrepresentations, even where fiduciaries are involved."); Restatement (Second) of Torts § 548A, cmt. a (1977) ("Not all losses that in fact result from the reliance are, however, legally caused by the representation. In general, the misrepresentation is a legal cause only of those pecuniary losses that are within the foreseeable risk of harm that it creates. There is an analogy here to the rules as to legal causation of physical harm resulting from negligent conduct . . . .").

Here, the statements and omissions by Boeing fall into a few different buckets. Plaintiffs point to statements and omissions in the operations manuals and the pilot bulletin, including statements before the crashes (*see* Third Am. Cplt., at ¶¶ 141, 147, 149, 154) and after the crashes (*id.* at ¶¶ 157, 162).[3] Plaintiffs also point to omissions during their training to become MAX certified. *Id.* at ¶ 73(f). Finally, Plaintiffs point to statements that Boeing made to the public at large about the safety of the MAX after the crashes. *Id.* at ¶¶ 109, 114, 117.

Plaintiffs' fraudulent misrepresentation claim fails from the get-go. Taking a step back, this Court already explained why a design defect cannot support a claim for a loss of wages.

---

[3] The Third Amended Complaint also includes one passing reference to the content of Boeing's website. *See* Third. Am. Cplt., at 4 n.1 of 58 (Introduction) (Dckt. No. 111). The solitary reference to the website is conclusory, falling far short of the standards for pleading with particularity under Rule 9(b).

There is too much distance between the defect and the loss of income, and proximate causation cannot fill the gap.

The same analysis equally applies to the fraudulent misrepresentation claim. Here, Plaintiffs allege that Boeing made false statements about the safety of the plane, and hid a number of problems. The theory of the case is that Plaintiffs expended time and money getting certified to fly the MAX, and incurred an opportunity cost in doing so (by giving up the opportunity to fly other planes). To support a claim, Plaintiffs would need to allege that they relied on those false statements, and that the statements caused them to suffer an injury.

The starting point for the fraudulent misrepresentation claim is a little different than the starting point for the strict liability and negligence claims. The product liability claims begin with a defective design. The fraudulent misrepresentation claim begins with a misstatement or omission.

The starting points are different, but they end in the same place. Either way, the claim relies on a chain of causation that is too long to support it. The misrepresentation claim alleges that Boeing made false statements, which led to certifications, and then crashes happened, which led to the grounding of the fleet, which led to a loss of flights, which led to a loss of income and the devaluation of the certifications. The chain of causation stringing together the statements and the injury is too long and too weak to support a claim.

The lack of proximate causation is a sufficient basis to dismiss the claim. Even so, the fraudulent misrepresentation claim suffers from a number of other defects, too, and each of them provides an independent basis for dismissal. Part of the problem is a lack of but-for causation and reliance. Another problem is a failure to plead with particularity.

41

## A.      Lack of Causation and Reliance

The first problem is a mix of but-for causation and reliance.  Plaintiffs have failed to allege that they suffered harm as a result of any false statements or omissions by Boeing.

Before long, the complaint runs into trouble.  The complaint covers a number of different types of statements.  For the sake of clarity, the Court will separately discuss three different types of statements:  (1) the written materials, (2) the training materials, and then (3) the public statements.

### 1.      The Written Materials

Consider, first, the written materials.  The complaint includes allegations about the operations manuals published before the crashes (*id.* at ¶¶ 141, 147, 149, 154).  The complaint also points to the revised manual (*id.* at ¶ 157) and the pilot bulletin (*id.* at ¶ 162) published after the first crash.

To bring a claim under their theory, Plaintiffs would have to plausibly allege that they read the materials and then made the decision to get certified to fly the MAX.  But there is no such allegation in the complaint.  That is, Plaintiffs have not alleged that they read the manuals and the bulletin, and then made the decision to get certified to fly the planes based on that content.

Reading the manuals is not enough.  *See id.* at ¶ 145 (noting that "[t]he FCOM is a 1,500-plus page manual").  To bring a claim, Plaintiffs would have to allege that they relied on the content of the manuals when deciding to get MAX certified.  But here, the complaint alleges no such thing.

The complaint alleges that Plaintiffs read the manuals, but stops short of alleging that they decided to get MAX certified because of the manuals.  *Id.* at ¶¶ 142, 148, 155, 158.

Plaintiffs don't allege that they relied on statements in the manuals when deciding to become MAX certified. Instead, the complaint states in a conclusory fashion that "Plaintiffs relied on BOEING's material representations and omissions by qualifying to operate and operating the MAX, and by foregoing opportunities to operate other aircraft types." *Id.* at ¶ 228; *see also id.* at ¶ 169 ("Each of the Plaintiffs received, reviewed, and relied upon the information provided by BOEING in the CBT, the FCOM, or the bulletins prepared by BOEING and communicated to Plaintiffs."). The complaint stops short of alleging that they relied on a statement in the manuals when deciding to become MAX certified.

For at least some of the Plaintiffs, there is a timing problem, too. A few of the Plaintiffs got MAX certified before the publication of the first manual in question in February 2018. *Id.* at ¶ 19 (Plaintiff Saunders on May 8, 2017); *id.* at ¶ 26 (Plaintiff McHardy in February 2017); *id.* at ¶ 31 (Plaintiff Cherif in January 2018). Reading the manuals after the fact does not get Plaintiffs very far, because the fraudulent statements must come before the alleged reliance. *See Phillips*, 19 N.E.3d at 1036 (dismissing a fraud claim for lack of causation when the plaintiffs decided to enroll at DePaul before publication of allegedly fraudulent employment information).

The content of manuals did not cause an injury, either. Plaintiffs allege that the manuals did not disclose the existence of the MCAS, and thus did not give Plaintiffs enough information to fly the plane safely. *See* Third Am. Cplt., at ¶ 220 (Dckt. No. 111) ("BOEING failed to disclose to Plaintiffs in the FCOM, on each date that it published and the Plaintiffs reviewed the FCOM, that the MCAS was incorporated on the MAX and could under certain conditions cause the plane to crash.").

43

Maybe so, but it makes no difference. The reason is simple. Plaintiffs *didn't crash*. They suffered no harm from a failure to tell them how to fly safely. They did not fly the plane unsafely in a manner that caused them to suffer an injury.

In addition to the operations manuals, the complaint points to the pilot bulletin, the TBC-19. But once again, the complaint quickly strays off course.

Many of the Plaintiffs have a timing problem for the pilot bulletin. Eight of the Plaintiffs became MAX certified *before* Boeing published the TBC-19 on November 6, 2018. *See id.* at ¶ 6 (Plaintiff Crye in May 2018); *id.* at ¶ 19 (Plaintiff Saunders on May 8, 2017); *id.* at ¶ 22 (Plaintiff Daguindeau on June 14, 2018); *id.* at ¶ 26 (Plaintiff McHardy in February 2017); *id.* at ¶ 29 (Plaintiff Taylor in October 2018); *id.* at ¶ 31 (Plaintiff Cherif in January 2018); *id.* at ¶ 37 (Plaintiff Soto in July 2018); *id.* at ¶ 40 (Plaintiff Saevarsson on October 30, 2018). Those eight Plaintiffs were MAX certified before the pilot bulletin, so the pilot bulletin did not cause them to get MAX certified.

For the remaining Plaintiffs, the complaint alleges that they became MAX certified after the pilot bulletin (or it doesn't pin down the chronology, one way or the other). *Id.* at ¶ 10 (Plaintiff Várhelyi at the end of 2018); *id.* at ¶ 14 (Plaintiff Urtubey on November 27, 2018); *id.* at ¶ 33 (Plaintiff Mullany on February 20, 2019); *id.* at ¶ 34 (no date for Plaintiff Hill); *id.* at ¶ 43 (Plaintiff James in February 2019); *id.* at ¶¶ 47–48 (no date for Plaintiff Chieza).

Still, the complaint fails to allege that those Plaintiffs relied on the pilot bulletin to their detriment. The complaint does not allege that the Plaintiffs (1) read the pilot bulletin; and then (2) made the decision to become MAX certified.

Any such allegation would push the boundaries of plausibility under *Twombly*. After all, the pilot bulletin didn't paint a rosy picture and give a cheery description of the MAX. The

bulletin warned pilots of "a possibility of an 'uncommanded nose down stabilizer trim due to erroneous Angle of Attack (AOA).'" *Id.* at ¶ 164.  The opportunity to pilot a plane that might be headed for a nose dive isn't exactly a selling feature.

To support their theory, Plaintiffs would have to allege that they read the pilot bulletin, and then made the decision to get MAX certified.  Once again, the complaint alleges no such thing.  Many of the Plaintiffs made the decision to get MAX certified before, not after, the publication of the pilot bulletin.  For the remaining Plaintiffs, none of them allege that they became interested in getting certified after reading about the possibility of plummeting to Earth in a nose dive.

### 2. The Training Materials

The second group of statements involves the content of the trainings.  *Id.* at ¶¶ 6, 10, 73(f), 78, 183(d), 192, 211–12, 219.  Plaintiffs allege that Boeing represented that the MAX was safe, because no one ever told them about the MCAS (again, the Maneuvering Characteristics Augmentation System) during the trainings.

Boeing "decided that MAX pilots, including Plaintiffs, should not be required, and ensured that MAX pilots would not be required, to undergo any MCAS training." *Id.* at ¶ 80.  As a result, "Plaintiffs did not receive any suitable training or testing on how to handle emergencies caused by or exacerbated by the MCAS or its malfunctioning." *Id.* at ¶ 82.

That claim fails for now-familiar reasons.  For starters, the chronology is backwards.  The statements and omissions at the training did not cause Plaintiffs to get certified.  Plaintiffs already made the decision to get trained – that's why they were at the trainings in the first place.

Plaintiffs allege that they "necessarily relied on the training and information provided by and through BOEING and when they made the important career decision to qualify to fly and to

fly the MAX to the exclusion of other career opportunities." *Id.* at ¶ 203. Once again, the chronology gets in the way.

The purpose of the training was to become MAX certified. Anyone attending a training had already made the decision to seek certification. So, information at the training did not lead anyone to decide to take the training. They were already there.

The failure to tell Plaintiffs how to fly the planes safely did not cause them to suffer an injury, either. *Id.* at ¶ 95 (alleging that proper training could have "allowed pilots to take proper action quickly, thus increasing survivability chances in emergency situations"); *id.* at ¶ 97 (alleging that inadequate training "increased the risk of accidents"); *id.* at ¶ 98 (alleging that inadequate training "compromised the safety of the Plaintiffs"). Plaintiffs never experienced an emergency. And they never crashed. No harm, no foul, no claim.

### 3. The Public Statements

The last group of statements involved public statements that Boeing made about the safety of the MAX after the first crash. *Id.* at ¶ 109 (alleging that Boeing "continued to represent that the MAX was safe to fly" after the "crash of JT610"); *id.* at ¶ 114 (alleging that Boeing made a public statement "[f]ollowing the crash of ET302"); *id.* at ¶ 117 (alleging that Boeing "continued to represent that the MAX was safe" despite "two devastating crashes").

The chronology gets in the way when it comes to the post-crash statements. To bring a claim, Plaintiffs would need to allege that Boeing made a false statement that caused them to suffer an injury. But here, many of the Plaintiffs decided to get certified *before* JT610 crashed on October 28, 2018. *See id.* at ¶ 6 (Plaintiff Crye in May 2018); *id.* at ¶ 19 (Plaintiff Saunders on May 8, 2017); *id.* at ¶ 22 (Plaintiff Daguindeau on June 14, 2018); *id.* at ¶ 26 (Plaintiff

McHardy in February 2017); *id.* at ¶ 31 (Plaintiff Cherif in January 2018); *id.* at ¶ 37 (Plaintiff Soto in July 2018).

For those Plaintiffs, the certifications came before the post-crash statements, so the statements did not cause the Plaintiffs to get certified. Post-crash statements did not induce pre-crash certifications.

Some of the Plaintiffs do allege that they became certified to fly the MAX after JT610 crashed. *See id.* at ¶ 14 (Plaintiff Urtubey on November 27, 2018); *id.* at ¶ 33 (Plaintiff Mullany on February 20, 2019); *id.* at ¶ 40 (Plaintiff Saevarsson on October 30, 2018); *id.* at ¶ 43 (Plaintiff James in February 2019). And for a few other Plaintiffs, the complaint is a bit sketchy about when they decided to get certified. *See id.* at ¶ 10 (Plaintiff Várhelyi at the end of 2018); *id.* at ¶ 29 (Plaintiff Taylor in October 2018); *id.* at ¶ 34 (omitting a certification date for Plaintiff Hill); *id.* at ¶¶ 47–48 (omitting a certification date for Plaintiff Chieza).

Even so, for those Plaintiffs, the complaint does not allege that they made the decision to get certified based on post-crash statements by Boeing. That is, Plaintiffs do not allege that they heard Boeing make statements about safety after the crashes, and then made the decision to get certified to fly a plane that crashed.

*      *      *

In sum, the complaint suffers from a number of interrelated problems, above and beyond the lack of proximate causation. The complaint does not allege but-for causation or reliance. That is, the complaint does not plausibly allege that the pilots relied on a statement by Boeing and suffered an injury as a result. Part of the problem involves the chronology, another part of the problem involves a failure to plead reliance, and a final part of the problem stems from the fact that Plaintiffs didn't crash. However you slice it, the complaint falls short.

### B.     Pleading with Particularity

The fraudulent misrepresentation claim fails for another independent reason.  Plaintiffs failed to plead with particularity, and thus failed to satisfy the heightened pleading standard for fraud claims.

Under Rule 9(b), a party who alleges fraud "must state with particularity the circumstances constituting fraud."  *See* Fed. R. Civ. P. 9(b).  The Seventh Circuit requires "that a plaintiff ordinarily must describe the 'who, what, when, where, and how' of the fraud – 'the first paragraph of any newspaper story.'"  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (quoting *United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854 (7th Cir. 2009)).  "Rule 9(b) requires that facts such as 'the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff' be alleged in detail."  *See Heffernan v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (quoting *Bankers Tr. Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir. 1992)).  The Rule requires plaintiffs alleging fraud to point to "specific misrepresentations."  *McMahan v. Deutsche Bank AG*, 938 F. Supp. 2d 795, 804 (N.D. Ill. 2013).

At the same time, the Seventh Circuit has cautioned against "an overly rigid view of the [newspaper story] formulation" and has emphasized that "what gets included in that first paragraph may vary on the facts of a given case."  *See Pirelli Armstrong Tire Corp.*, 631 F.3d at 442.  For example, the Seventh Circuit has noted some flexibility in Rule 9(b)'s application when information lies outside of a plaintiff's control.  *See Emery v. Am. Gen. Fin., Inc.*, 134 F.3d 1321, 1323 (7th Cir. 1998).  But, in general, the rule exists to "discourage a sue first, ask questions later philosophy."  *Pirelli Armstrong Tire Corp.*, 631 F.3d at 441.

48

Plaintiffs argue that they have satisfied Rule 9(b)'s particularity requirements and, to the extent they haven't, it is because the necessary information is under Boeing's exclusive control. *See* Pls.' Resp. to Mtn. to Dismiss, at 20–23 (Dckt. No. 141). In support, Plaintiffs include a chart detailing the "'what, when and where' of the litany of Defendant's representations and concealments alleged in the [Third Amended Complaint]." *Id.* at 22.

That chart does not get the claim off the ground. It is chock-full of generalities.

Start with Plaintiffs' allegations about Boeing's written materials and public statements. For example, Plaintiffs say that the "what" of one of their alleged representations is that "the MAX could be safely operated." *Id.* Plaintiffs cite paragraph 219 of the Third Amended Complaint, and that paragraph, in turn, simply says that "BOEING represented to the Plaintiffs that the MAX could be safely operated." *See* Third Am. Cplt., at ¶ 219 (Dckt. No. 111). The complaint does not quote Boeing, or point to any specific passages in Boeing's materials.

Plaintiffs cite only to their own gloss on the general content of Boeing's representations. When it comes to Rule 9(b), a thick coat of gloss won't do. A complaint needs to point to what the alleged fraudster actually said. A high-level paraphrase doesn't cut it.

The complaint includes other vague, non-descript statements, alleging that Boeing represented that the MAX was "safe." *See, e.g.*, *id.* at ¶ 109 ("BOEING continued to represent that the MAX was safe to fly."); *id.* at ¶ 117 ("BOEING continued to represent that the MAX was safe . . . ."); *see also id.* at ¶¶ 172, 202. From a pleading standpoint, there is no meat on the bone. The allegations are long on conclusions and short on specifics.

As another example, Plaintiffs point to Boeing's statement that "'MAX pilots do not need additional substantive (including simulator) training or testing to fly' the MAX." *See* Pls.' Resp. to Mtn. to Dismiss, at 22 (Dckt. No. 141). Here, too, Plaintiffs cite a paragraph of the complaint,

but that paragraph simply says: "[o]n the date(s) that each of the Plaintiffs qualified to fly the MAX, BOEING represented to the Plaintiffs that MAX pilots did not need additional substantive (including simulator) training or testing to fly revenue-generating flights." *See* Third Am. Cplt., at ¶ 222 (Dckt. No. 111). Once again, all that stands behind the "what" of the allegation is Plaintiffs' say-so.

Plaintiffs also fail to plead the "how" of the alleged fraud. As discussed above, Plaintiffs stop short of alleging that they relied on the operating manuals, bulletins, or public statements when deciding to become MAX certified. Instead, the complaint is conclusory. *See id.* at ¶ 228 ("Plaintiffs relied on BOEING's material representations and omissions by qualifying to operate and operating the MAX, and by foregoing opportunities to operate other aircraft types."). The complaint doesn't describe how the fraud worked if it doesn't allege that Plaintiffs read or heard Boeing's statements and then decided to get MAX certified on that basis.

Plaintiffs' allegations about the training sessions also don't pass muster under Rule 9. Plaintiffs allege that at various training sessions they were never told that the MAX was unsafe or that the MAX had been equipped with the MCAS. But these allegations don't say that *Boeing* ran the trainings or said anything, for that matter. For example, Plaintiffs allege that "[i]n May 2018, Capt. Crye underwent a full ground school course and a full simulator course on two of the only MAX simulators in the world . . . . *The training was led by Air Canada instructors who were trained by BOEING.* None of the training materials, related BOEING-trained instructors, or BOEING pilots ever mentioned the introduction of a new system on the MAX, known as MCAS." *Id.* at ¶ 6 (emphasis added).

Here, Plaintiffs' "who" doesn't work under Rule 9. For starters, the Plaintiffs haven't alleged the identity of the *specific person* – Air Canada instructor or otherwise – who made the

misrepresentation. *See Rocha v. Rudd*, 826 F.3d 905, 911 (7th Cir. 2016) (affirming the dismissal of a complaint that "fail[ed] to provide the specific names, dates, times, or content of the misrepresentations or omissions that [gave] rise to the alleged fraud").

Moreover, Plaintiffs never allege that Boeing said – or didn't say – anything because non-Boeing instructors ran the course. Instead, Plaintiffs simply allege that these instructors were "trained by Boeing." That won't cut it. *See Connick*, 675 N.E.2d at 592 (holding that statements "not made by Suzuki but by Suzuki dealers . . . cannot be the basis of a common law fraud count against Suzuki unless plaintiffs have adequately alleged that the dealers were the agents of Suzuki").

Plaintiffs' allegations based on the MAX's training materials also don't pass muster under Rule 9. Plaintiffs allege that they became "qualified to fly the MAX after reviewing the brief computer-based training" called the "CBT." *See* Third Am. Cplt., at ¶ 10 (Dckt. No. 111). They allege that this training was "prepared by Boeing." *Id.*; *see also id.* at ¶¶ 14, 19, 22, 26, 29, 31, 33–34, 37, 40, 43, 47. But notably absent are any allegations about the contents of the CBT other than the statement that it did not mention the MCAS. *See, e.g.*, *id.* at ¶ 10. None of the allegations give a specific statement in the CBT that the Plaintiffs allege was fraudulent without a discussion of the MCAS.

And once again, Plaintiffs do not allege that any Boeing employee communicated the information in the CBT to them. Often the training presentation was given by an *unnamed* airline employee. *See id.* at ¶¶ 10, 14, 19, 22, 26, 29, 31, 33–34, 37, 40, 43, 47. When Boeing employees are mentioned, they aren't mentioned with the specificity required by Rule 9 – they go unnamed. *See id.* at ¶ 29 ("The CBT was prepared by BOEING and there were BOEING instructors on conference calls to assist with the training.").

When it comes to the trainings, Plaintiffs do not point to a specific representation made by a specific person at Boeing, or a specific representation in a document from Boeing. This lack of detail is insufficient under Rule 9(b). *See Rocha*, 826 F.3d at 911; *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) ("Here, the complaint tells us nothing about the nature of the purported agreement to defraud the plaintiffs, such as when it was made or which individuals at Goldman Sachs arranged the conspiracy.").

Finally, Plaintiffs argue that Rule 9(b)'s particularity standard should be relaxed because they didn't have access to all the facts necessary to state their claim. "Specificity requirements may be relaxed, of course, when the details are within the defendant's exclusive knowledge." *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994).

But "flexibility in the face of information asymmetries should not be conflated with whistling past the rules of civil procedure." *Pirelli Armstrong Corp.*, 631 F.3d at 446. Instead, in cases where plaintiffs lack the information needed to plead fraud, "Rule 9(b) is satisfied by a showing that further particulars of the alleged fraud could not have been obtained without discovery." *Emery*, 134 F.3d at 1323.

Plaintiffs can't blame Boeing for their failure to plead with particularity. If Boeing made misrepresentations to Plaintiffs, then Plaintiffs should know what Boeing said, to whom, and when. Plaintiffs didn't make any showing that they could not satisfy Rule 9 without discovery. It is not asking too much to require Plaintiffs to pin the misrepresentations down, as Rule 9(b) requires. Plaintiffs should know what they heard.

The fraudulent misrepresentation claim is dismissed for failure to plead with particularity as required by Rule 9(b).

**Conclusion**

For the foregoing reasons, the Court grants Boeing's Motion to Dismiss Plaintiffs' Third Amended Complaint.

Date:      October 31, 2022

_____
Steven C. Seeger
United States District Judge